INTERSTATE COMMERCE COMMISSION v. EAST TENNESSEE, V. & G. RY. CO. et al.

(Circuit Court, E. D. Tennessee, S. D. February 2, 1898.)

No. 384.

1. CARRIERS—INTERSTATE COMMERCE LAW—FINDINGS OF FACT BY COMMISSION.
The findings of fact made by the interstate commerce commission are only prima facie evidence. The court may direct further evidence to be taken, and, if it shall appear that the facts are otherwise than as reported by the commission, the court would be governed by the facts as found by itself.

2. SAME—LONG AND SHORT HAULS—ORDER OF COMMISSION.
When the circumstances and conditions are such as to justify it, a railroad company may charge more for the shorter than for the longer haul without first obtaining leave from the commission.

3. SAME—REASONABLE RATES.
The question whether rates are just and reasonable in themselves is in some measure a relative one, and may be tested by a comparison of the particular rates with those accepted elsewhere for a similar service.

4. SAME—DISCRIMINATING RATES.
The ultimate power of determining the right and justice in the matter of discriminating rates rests with the courts.

5. SAME.
The fourth section of interstate commerce law is to be applied upon a scale of comparison between the dissimilarity of conditions and the disparity of rates, and a greater charge for a shorter than for a longer haul may be enjoined, though there may be dissimilarity of conditions, provided the dissimilarity is not so great as to justify the discriminating rate.

6. SAME—POWER TO FIX RATES.
Neither the commission nor the court has power to fix rates. The court is restricted to an order enjoining the continuance of an unlawful practice.

7. SAME—COMPETITIVE POINTS.
The fact of competition at Nashville by the Cumberland river, in addition to that between railroads, does not justify the making of freight rates to Chattanooga ranging from 25 to 74 per cent. higher on the different classes of freight than those charged on similar classes to Nashville, over the same route, which is 151 miles beyond Chattanooga. Such rates are both an unlawful discrimination, under section 3, and a violation of section 4; and an order of the interstate commerce commission, forbidding higher charges to Chattanooga than to Nashville, will be enforced.

This was a petition by the interstate commerce commission for the purpose of enforcing an order made by it forbidding the East Tennessee, Virginia & Georgia Railway Company and others from charging higher rates from Boston, New York, Philadelphia, and Baltimore to Chattanooga, Tenn., than to Nashville, Tenn., over the same routes.

L. A. Shaver, for complainant.
Ed. Baxter, for defendants.

SEVERENS, District Judge. This case originated in a complaint lodged with the interstate commerce commission, and filed April 9, 1890, by the Board of Trade of Chattanooga, an association of merchants and manufacturers of that city, charging: First. That the respondents, being engaged in interstate commerce as common carriers

and transporting freight and participating in through rates of charges for transportation thereof from Boston, New York, Philadelphia, and Baltimore, designated as Eastern seaboard points, to Nashville, Memphis, and Chattanooga, in the state of Tennessee, charged through rates to Chattanooga which were unjust and unreasonable in themselves as well as relatively to those to Nashville and Memphis. Second. That the Nashville, Memphis, and Chattanooga were competitors for business in the same territory, and that the through rates charged and participated in by the respondents were much lower to Nashville and Memphis than to Chattanooga "for transporting like property from said seaboard points under the same, or substantially the same, circumstances and conditions," and that the respondents were thus guilty of unjust discrimination against Chattanooga in giving an undue preference to Nashville and Memphis. And, third, that the respondents, under such through rates, charged and received a greater compensation for the transportation of a "like kind of property under substantially similar circumstances and conditions" from said Eastern seaboard points to Chattanooga than they charged for such transportation over their several lines through Chattanooga to Nashville and Memphis, which last-mentioned cities are 151 and 310 miles, respectively, farther from said Eastern seaboard points than is Chattanooga. In terms it is alleged that each of the first four sections of the act to regulate commerce is violated. In support of these allegations the complainant referred to the tariffs on file with the commission, and exhibited tables illustrating the alleged discrimination, and the unlawful character of the rates complained of in other respects. The complainant prayed for an order requiring the respondents to cease and desist from said violations of the act to regulate commerce, and that they be required to transport property to Chattanooga from Eastern seaboard points at such rates as the commission might decide to be just, and also that such order require the respondents to cease transporting property from Eastern seaboard points to the cities of Nashville and Memphis for lower rates of freight than they charged for transporting like property to the city of Chattanooga; and there was also a prayer for such other and further relief as the commission might deem necessary to grant relief to the merchants and manufacturers of Chattanooga. Notice was given to the respondents of the filing of this complaint, and most of the respondents appeared and answered, setting up various defenses, the details of which it is unnecessary to go into, it being sufficient for the present purpose to say that the answers put in issue the question whether the rates charged by the companies on through freight from Eastern seaboard points to Chattanooga were unjust and unreasonable in themselves, and also the question whether the circumstances and conditions affecting rates at Nashville and Memphis on through freight were so far dissimilar from those existing at Chattanooga as to justify them in making to the three cities the relative rates complained of.

A hearing was had, and testimony taken, before the commission, and the commission, after having fully heard the counsel for the

complainant and for many of the various railroad companies, announced its decision upon the matter of the said complaint on December 30, 1892.    Its conclusion was that the complaint was sustained, upon grounds and reasons hereafter to be referred to, and thereupon the commission ordered and required the respondents to "cease and desist from making, enforcing, or receiving any higher rates for such transportation aforesaid to Chattanooga than are or may be at any time accepted by them for like transportation to Nashville."    The respondents were notified of the order, but refused to comply with it, whereupon the commission applied to this court, sitting in equity, under the sixteenth section of the act to regulate commerce, praying that the court should, by proper process, restrain the respondents from continuing the violation and disobedience of the order of the commission.    Notice was given to the respondents of the filing of the petition, and many of them appeared and answered.    Each side took further proof, and the case was finally submitted to the court on the report and opinion of the commission, and further testimony taken in this court.

From this outline of the history of the proceedings it is seen that the matter has been pending for a long time, and it might have happened that some change of circumstances should have taken place between the making of the complaint to the commission, and the final submission of the matter to the court.    But the additional testimony above referred to has been quite recently taken, and seems to indicate that the circumstances remain substantially as they were in the beginning, and the case has been argued and submitted here without any reference to a change in the conditions existing at the present time.    It is therefore proper to assume that there is nothing in the delay which has occurred to affect the conclusions which should be reached upon the original complaint.

The case has been fully and elaborately argued, not only at the bar, but in the briefs which have been since submitted.    At the hearing it was intimated by the court that in the investigation it must make it would be important to consider whether the commission had, in reaching its conclusion, refused to consider and give due effect to the difference in the conditions existing, respectively, at Nashville and Chattanooga affecting the subject of through rates, and among them competition between carriers taking freight to and from the former place, and that this might be considered in determining whether the order which it had made was a lawful one.    But upon further reference to the provisions of section 16 of the commerce act and the decisions of the supreme court construing them it appears very clearly that the scope of the power and duty of the court is wider than that thus indicated.    By that section it is provided that upon an application by the commission to the circuit court of the United States for a mandate requiring obedience to an order of the commission, and notice of such application to the common carrier refusing such obedience, the court shall proceed to hear and determine the matter speedily as a court of equity, without the formal pleadings and proceedings customarily employed in such courts, but in such manner as to do justice in the premises.    "And to this end such

court shall have power if it think fit to direct and prosecute in such mode and by such persons as it may appoint all such inquiries as the court may think needful to enable it to form a just judgment in the matter of such petition, and on such hearing the findings of fact in the report of said commission shall be prima facie evidence of the matters therein stated." Thereupon the court, if it shall find, upon all the matters before it,—"the whole body of the evidence,"—that the order was a lawful one, and has been disobeyed, is required to issue its mandatory process to compel the observance of the order. Under these provisions it has been held that the court is not restricted in its inquiry to the findings of the commission either as to the law or fact on any of the questions involved, but proceeds to determine all such questions for itself, giving due effect to the findings of fact by the commission as prima facie evidence of the facts reported.

It will thus be seen that whether the commission should or should not hold as a matter of law that it could accord to the railway carriers the privilege of fixing their rates upon consideration of the differing conditions, such as competition at a given point from other carriers who are likewise amenable to the law, such conclusion would in no wise affect the duty of the court to inquire and determine whether the railway carriers had such privilege or not, and, if it should be held that such privilege existed, to give effect to it as one of the grounds of its decision. The findings of fact made by the commission are only prima facie evidence. The court may direct further evidence to be taken; and, if it shall finally appear that the facts are otherwise than as reported, the court would be governed by the facts as found by itself in forming its judgment. In the present case the commission put its order upon the ground that the defendants had not the right, in view of the fact that no previous authority had been given by the commission to exercise that privilege, to depart from the rule against charging more for a short than for a long haul, because of a different condition arising from the competition at Nashville by other carriers, part of whom were railroad companies, engaged in through traffic with the East. In this undoubtedly it was in error. The contrary doctrine is now well established. But this error is not material. The legal reason given may be wrong and the order right if, upon the facts, the latter should be found by the court to be warranted by law. Nor would it affect the duty of the court if the commission had founded its order upon one provision of the act, and the facts brought the case within some other. The question, therefore, is whether the order made was a lawful one in the circumstances as they are made to appear. Now, I think that no one can read these schedules fixing the rates of through traffic from the seaboard to Chattanooga, and to Nashville and Memphis through Chattanooga, without being instantly and strongly impressed that there is something wrong in the principle on which such rates are adjusted, and that the equality which the commerce act was enacted to secure has been utterly disregarded. It appears from the record that the through rates for freight from New York and Boston to Chattanooga, Nashville, and Memphis, respectively, which are complained of, are as follows:

First Class:

To Chattanooga ...............................................   $1 14
To Nashville (151 miles further on)...................................   91
To Memphis (310 miles beyond Chattanooga)........................   1 00

Second Class:

To Chattanooga ...............................................   98
To Nashville ...............................................   78
To Memphis ...............................................   85

Third Class:

To Chattanooga ...............................................   86
To Nashville ...............................................   60
To Memphis ...............................................   65

Fourth Class:

To Chattanooga ...............................................   73
To Nashville ...............................................   42
To Memphis ...............................................   45

Fifth Class:

To Chattanooga ...............................................   60
To Nashville ...............................................   36
To Memphis ...............................................   38

Sixth Class:

To Chattanooga ...............................................   49
To Nashville ...............................................   31
To Memphis ...............................................   35

From this it appears that, comparing the rates to Chattanooga and Nashville, although the distance to Chattanooga is 151 miles less than to Nashville, the charge on first-class freight to the former place is 25 per cent. higher than to the latter, on second class it is 26 per cent. higher, on third class it is 43 per cent. higher, on fourth class it is 74 per cent. higher, on fifth class it is 67 per cent. higher, and on sixth class 58 per cent. If the charges are reckoned by mileage, they are about 100 per cent. higher on freight of the three lower classes from New York to Chattanooga than they are to Nashville, and over 67 per cent higher in the aggregate of rates for all the classes. The result is that the merchants of Chattanooga can ship their goods from the East through to Nashville on the Nashville rate, and then ship them back to Chattanooga on local rates at less cost than the charges on an original shipment direct to Chattanooga. The natural result is that the merchants and tradesmen of Nashville can undersell the merchants and tradesmen of Chattanooga in much of the commercial sphere of the latter place, for the Nashville people can ship directly to the points tributary to Chattanooga; and the evidence shows it is the practical result. There is evidence also tending to show that the commercial business of Chattanooga has for years been stagnating. It may be, and probably is, true that this is in part due to other causes; but, considering that no small part of the value of goods shipped over the long distance from the Eastern markets to Chattanooga is represented by the freight rates it has borne, it would be manifest, without other evidence, that the great disparity of rates above shown would go far to crush out the commercial life of a city so heavily burdened.

Comparison of the rates to Memphis and to Chattanooga is not so important in the present case, because, as is said by the commission, the greater proximity of Nashville to Chattanooga renders the question between the two last-named places the leading issue. Nevertheless, a reference to the Memphis rate is of value in determining whether the

rates to Chattanooga are reasonable rates, it appearing that, though the distance is nearly one-third greater than to Chattanooga from the East, rates are accepted for the Memphis business considerably less than those at Chattanooga. The rate per mile of transportation shows a great disparity, and this disparity goes in bulk, or nearly so, into the profits. It is conceded that the competition at Nashville should be taken into account, though my impression is strong that the competition arising from the rather limited navigability of the Cumberland river is made much more of than the real facts justify. Without much regard to the matter of rates, the carriage of freight by the navigation of such streams as the Cumberland has been almost entirely discontinued in recent years. The delays, the hazards and uncertainties, which attend the navigation of such rivers, have induced shippers to greatly prefer and to rely upon transportation by rail. It is conceded also that the railroad companies have a just right to insist that their interests and those of the stockholders who have invested their money in the business should also be considered; and the court, in my opinion, would not be faithful to its duty if it should ignore those interests, or deny them legal protection. But, on the other hand, the just claims of the public, and especially the relative rights of communities and the individuals who constitute them, to the public service undertaken by common carriers, must be also taken into account and protected. All these things are to be put in the balance, and to each party should be given its right according to the facts as they appear in every case.

The duty which the court owes to the public is surely not less than that which it owes to the carriers. It is admitted by the court that rate-making is the peculiar province of the carriers, and their schedule should not be interfered with by the commission or the courts unless they are against conscience; and by that I mean a conscience instructed and regulated by the law. But it is to be remembered that the railroad business of the country is conducted by able men, animated, as it is right to suppose, with the desire to promote the interests of those whom they serve. Further, to promote the efficiency of their work, the officers of the various companies have their associations for the purpose of comparing, studying, and adjusting the rates of traffic on their several lines. In the absence of the other party, they have everything their own way. It would be expecting something not encountered or expected in other branches of business if we anticipated that they would assume a judicial attitude towards those with whom their business is to be done. And so it is liable to happen that in devising a scheme of rates to compensate for the moderate profits on some part of their traffic which is affected by competition, by heavier rates on other parties, and at places where they are not so affected, injustice may be done in the disproportion of the burden laid upon the different communities. And that is what I think has happened here. There is in this no impeachment of the integrity of any one. It is not a question of intention, however, but is whether the thing done is in contravention of the statute. Conceding that some allowance should be made for the conditions at Nashville and the rigor of the rule of the long and short haul clause of the fourth section moderated to some extent, as it was held

might be done in the case of Interstate Commerce Commission v. Alabama Midland Ry. Co., 168 U. S. 144, 18 Sup. Ct. 45, the disproportion in the present case is too gross. If, for such causes as existed here, such unequal charges can be made along the same line of traffic, the inevitable result must be that the commerce act will prove of no value, and the leading principle of the common law relating to the same general subject will be overthrown. The railroads cover the country like a web. Only the unproductive and inaccessible places are isolated from their routes. The places where they meet and cross each other, and thus come in competition, are almost innumerable. They are thickly located in all the commercial parts of the country. If the fact of such competition is allowed to become a dominating factor in fixing the relative charges of transportation to the different places along the lines, those communities where there is no competition must be blighted by the disadvantage with which they are burdened, and the favored places grow prosperous in the sacrifice of others. Counsel for the respondents, after noting the wider distance between competitive points in the southern portion of the country, says:

"It is not unusual for a Southern railroad to run for a hundred miles from one competitive point to another, where the intervening territory is very poor, and sparsely settled. The distance between such competitive points is so great that it is practicable for railroads to make a greater charge for a shorter than for a longer haul."

With this as the rule in adjusting rates, it seems certain that the poor places must become poorer, and the localities more sparsely settled than ever. At least, this would seem to be the very probable tendency. And although I must express an opinion upon a mere question of policy for the carriers with much diffidence, I am very strongly inclined to the belief that their interests would, in the long run, be better promoted by adhering more closely to the rules of the statute than was done in the present case, or is likely to be done under the practice which their counsel endeavors to justify. And public policy would also be advanced by the opposite course not only in the encouragement which would thus be given to the distribution of commerce and population, but also in extending that equality of privilege which it is one of the prime objects of legislation to promote. I am aware that these observations may be thought somewhat general. But the subject must necessarily be treated on broad lines. The commerce act is drawn upon such, and the matters above referred to touch and deeply affect the consideration of cases of this character.

The duty devolved upon the court by this act is new, and somewhat difficult. In my opinion, it can be most wisely and profitably discharged by estimating the special facts of each case in the light of the general principles which congress has embodied in the law. No test is given by the act for determining the extent or nature of the dissimilarity of conditions which will make it "substantial," and the question is left to be determined in the first instance by the commission, and ultimately by the court upon each case as it arises. There is nothing singular in this. It is another and new instance

of questions for which the law furnishes no definite test. For example: Where negligence in the management of a railroad is imputed, and legal liability is sought to be charged thereon, the issue is a broad one, and its determination must depend upon the application of a general test; and it must happen that judges and juries who are called to decide the question are much less familiar with the details of the business and the requirements of safe management than those who, from many years' experience, have become expert in such matters. And so, where questions of reasonableness are presented, or other like questions of a general character. But there is a necessity that such questions be decided, and the courts and juries are delegated to decide them, however much of skill and experience may be involved in the controversy. or the solution of it. As the circumstances vary infinitely and constantly in the course of such business, it would seem that congress must have intended something unusual and peculiar, out of the ordinary course, not ordinarily incident to the business, as that which would create a substantial dissimilarity; for otherwise the vast bulk of transportation would not be subject to the rule at all. The case of Interstate Commerce Commission v. Alabama Midland Ry. Co., above cited, is much relied upon by counsel for the railroad companies as giving warrant for the discrimination made in the present case, but the supreme court in that case, while reaffirming the doctrine that competition between railway carriers might, and frequently ought to, be considered in adjusting rates under the long and short haul clause, yet took pains to prevent the inference from its opinion that it should be regarded as a controlling consideration. In that case the discrepancy in rates was slighter than that here shown, and the competition was by water transportation on a great river, navigable at all seasons of the year, and opening into the Gulf. Both the courts below had concurred in holding that the commission was wrong in thinking the disparity of charges was too great in view of the facts, and the supreme court did not find sufficient reason for reversing their decree.

It is assumed in argument by counsel in making defense that the rates to Chattanooga are just and reasonable in themselves. This, it is said, is conceded, and upon the premises it is urged, in substance, that the public at Chattanooga has no right to complain if the respondents lower their rates to Nashville. In one sense, this is true. But the suggestion is fruitful of other considerations. The question whether the rates are just and reasonable in themselves is in some measure a relative one; that is to say, it may be tested by a comparison of the particular rates with those accepted elsewhere for a similar service, and whether the instances thus employed are or are not such as by their relation to the case in hand are subject to the operation of some other provision of the commerce act, is immaterial. Besides, I think the question of the justness and reasonableness of rates under the first section is colored by the other provisions of the law, and by the general policy of the whole enactment, which is to effect the equality of charges. And, at all events, it seems to me clear that the charges accepted for a longer haul may be referred to for the purpose of considering the reasonableness of the charges made for the shorter haul.

Such comparisons are applied to every other kind of business, and the fact that there may be competition in such business would not be a controlling consideration, for the presumption would always be that the compensation charged for the service or thing is sufficient to be reasonable. The presumption is not, of course, a conclusive one, but would seem a fair one, in the absence of special circumstances. It is not according to my understanding that it is conceded that the rates to Chattanooga are just and reasonable in themselves. The contrary is alleged in the complaint made to the commission and the view of the latter seems to have been otherwise, though its order is not put upon that ground. If, as I gather from the testimony, the through rates to Nashville afford a fair profit to the carriers, whether the Northern trunk lines or the respondents (and it is reasonable to suppose they would not engage in the business without it), there is substantial ground for contending that the same charge for carrying freight from the East to Chattanooga would afford a reasonable profit, and would, therefore, be a reasonable charge. If the respondents are allowed, as they are by the order of the commission, to make the same charge for carrying to Chattanooga as for carrying to Nashville, the rate, having regard to the difference in distance, would be about $16\frac{1}{2}$ per cent. higher to Chattanooga than that which they charge to Nashville, and the percentage is an increment of the profits. It may be modified slightly by circumstances, none of which are perceived, however, of any importance. If railway carriers engage in a competitive struggle for business at a place where they meet, and underbid each other or other carriers to a point which is not in itself remunerative, can they turn back on the line, and, taking advantage of the conditions existing at other localities, arising either from the fact that there is no opportunity for competition, or from the fact that by concert of the carriers there is none, charge such rates for the shorter haul as shall make good their lack of profits in competitive business, and even up the profits on their whole business to the point they set before themselves as reasonable? To the proposition thus roundly stated, no doubt counsel for the carriers would say that they could not contend for it. And yet this is the result reached by the not very indirect steps of the argument. And the proposition itself cannot be admitted without "tearing up by the roots" the whole scheme of the commerce act. This is one of the considerations tending to minimize somewhat the privilege arising from competition. In this connection, and as bearing upon the subject now under discussion, it is proper to observe with reference to the considerations resulting from a comparison of the volume of traffic between the seaboard points and Nashville that it appears to be about equally divided between the Northern and Southern lines.

In the full and elaborate brief of counsel for the railways several reasons are advanced why it would be difficult to so readjust the rates as not to discriminate against Chattanooga. Attention has been given to all of them. But none of them, in my opinion, rests on any sufficient ground, or constitutes any valid justification. One of these reasons is so striking and significant that it deserves special consideration. It is urged that the Louisville & Nashville Railroad Company is vitally interested in maintaining the commercial importance of Nashville, and

cannot, with due regard to that purpose, so adjust the rates at that place as to enable the respondents to do otherwise than discriminate against Chattanooga. But it appears that that company owns and controls a majority of the stock of the Nashville, Chattanooga & St. Louis Railway Company, the respondent carrier which constitutes that part of the through lines which extends from Chattanooga to Nashville, and fixes the rates for that road. It is therefore in a position to insure to Nashville such concessions as to advance its favoring purpose with reference to that city. It really has no competition there unless it be from the navigation of the Cumberland river. Referring again to that feature of the case, compare the situation of Chattanooga with that of Nashville in that regard. The former is only 448 miles by rail from the terminus of water transportation at Charleston, and less than that from Savannah, both of which places have uninterrupted communication by steam and sail with New York and the other Northeastern seaboard cities. The route is not more circuitous by either place from the east to Chattanooga than by the Cumberland river to Nashville. The rail portion of the latter route is very much greater than that of the route to Chattanooga when the transportation is partly by rail and partly by water. Chattanooga is so much better situated in its relation to the Eastern ports, if it is allowed the legitimate benefit of competition by water transportation, that it is very difficult to find any just reason why the charges to that place should be so out of proportion to those at Nashville. Chattanooga, too, has more railroads. They might compete there if they would. They do not think it to their interest to do so. And thus it is that Chattanooga, with a location nearer to the Eastern seaboard ports, and having many more railroads than Nashville, is yet denied the benefit of that advantage by reason of the competition at Nashville of one railroad with the navigation of the Cumberland river, an element of trifling importance when compared with the transportation by sea on the route to Chattanooga. The natural advantages greatly favor the latter place. In my opinion the faculty of rate-making has here completely frustrated the law. The scope of the statute is universal, and all the public in every part of the country is entitled to enjoy its benefits. Nor is it a piece of shreds and patches with large rents for great mischiefs to flourish in. Now, the purpose to increase the commercial prosperity of Nashville is in itself a laudable one, and the court would be far from having any inclination to obstruct it when it is pursued in a lawful way. It is to be hoped and believed, however, that the carriers will be able to find a way to remedy the injustice of the present situation without prejudice to any beneficent purpose towards Nashville. But it is a hard measure of justice to Chattanooga if the upbuilding of the one city is to be done at the charge of the other, by selecting the latter as one to bear the oppressive rates which shall go to make up for the moderate rates charged at the former. Moreover, the reason given shows the estimate which railway carriers themselves have of the effect of their freight rates upon the commercial prosperity of the localities subject to them.

Many topics connected with the subject of schedule-making have been thoroughly and ingeniously discussed. The paths of all these arguments submitted lead to these results: The conditions at Nash-

ville are dissimilar to those of Chattanooga. This fact suppresses the long and short haul provision and justifies discrimination. The extent of the discrimination must be confided to the judgment of the railway officals, whose ability and experience best qualify them for the task. Nowhere in the argument is there any concession or suggestion of any conclusion other than this. All avenues leading elsewhere are carefully closed. If this be the ground upon which we come, there is nothing for the commission or the court to do but to take notice of the fact that the conditions are dissimilar, and abandon all further inquiry. Of course, it is fundamental that no such proposition as this can be admitted, whether we consider the case under the third or (as I think) under the fourth section of the act. Congress, after prescribing certain rules and regulations for such business, and to guard against unfair and unjust discrimination in the making of rates, provided a commission, and charged it with the supervision of the conduct of railway carriers, and with the duty of requiring and enforcing compliance with the rules and regulations of the act. To secure judicial inquiry and determination of questions between the commission and the carriers arising in the course of business, and process adapted to give effect to such determination, jurisdiction was established in the circuit courts for those purposes. Congress must be presumed to have understood that the courts would not be so adept as the carriers in the intricacies of schedule-making and the adjustment of rates, but it nevertheless committed the ultimate power of determining right and justice in such matters to such measure of sound judgment, good sense, and just discrimination as it assumed the courts might possess. This is all that can be invoked, but to this the public as well as the carriers are undoubtedly entitled. I have elsewhere indicated my opinion to be, in substance, that the question coming before the courts can best be decided upon a field somewhat removed from the labyrinth of the details of tariff schedules, and in more unobstructed view of the larger and more controlling facts of the case. I am aware that the commission in December last, in announcing its opinion in the case of Savannah Bureau of Freight & Transportation v. Charleston & S. Ry. Co., evidently disheartened by the adverse rulings of the supreme court in recent cases,—more especially those of Interstate Commerce Commission v. Cincinnati, N. O. & T. P. Ry. Co., 167 U. S. 479, 17 Sup. Ct. 896, and Interstate Commerce Commission v. Alabama Midland Ry. Co., 168 U. S. 144, 18 Sup. Ct. 45,—seems to give up section 4 as of no force or effect in any case where the conditions are not "substantially similar." After referring to its former holding that competition between carriers subject to the statute did not create such dissimilarity of conditions as would justify discrimination, the commission goes on to say:

"Since then,' however, the supreme court of the United States, by its decision in the case Interstate Commerce Commission v. Alabama Midland Ry. Co. (decided Nov. 8, 1897) 168 U. S. 144, 18 Sup. Ct. 45, has determined that this view of the law is erroneous, and that railway competition may create such dissimilar circumstances and conditions as exempt the carrier from an observance of the long and short haul provision. Under this interpretation of the law, as applied to the facts found in this case, we are of the opinion that the charging of the higher rate to the intermediate points, as set forth,

is not obnoxious to the fourth section. The section declares that the carrier shall not make the higher charge to the nearer point under 'substantially similar circumstances and conditions.' If the conditions and circumstances are not substantially similar, then the section does not apply, and the carrier is not bound to regard it in the making of its tariffs."

Now, I do not understand that such a conclusion follows from that decision. On the contrary, I suppose that when a violation of the long and short haul provision is charged, competition is one of the elements which enter into the determination whether the conditions are similar, and, if dissimilarity is found, then the further question arises whether the dissimilarity is so great as to justify the discrimination which is complained of. The language of the act ought not to be tied up by such literal construction. If it were, then if it should be found that the dissimilarity of conditions is really in favor of the locality discriminated against, the provision would not apply,—a result contrary to the manifest intent. In other words, my opinion is that the restraint of section 4 is to be applied upon the scale of comparison between the dissimilarity of conditions and the disparity of rates, and that it is competent under that section to restrain the exaction of the greater charge for the shorter haul, although there may be a substantially dissimilarity of conditions, provided the dissimilarity is not so great as to justify the discrimination made. But the long and short haul clause is only one of the specific provisions employed for the general purpose of the act. The third section underlies the fourth, and supplies the principle on which it rests; so that, if the literal construction referred to be put upon the fourth section, the case would still be exposed to the third section, which forbids undue preference to one locality or the subjection of another to any undue disadvantage. With respect to the power of the court to deal with the order of the commission, counsel for the respondents refer to the opinion delivered by me in the case of Interstate Commerce Commission v. Detroit, G. H. & M. Ry. Co., 57 Fed. 1005, that, having regard to the language of the sixteenth section of the commerce act in prescribing the duty of the court to enforce the order of the commission if it is found to be lawful, and the lack of any words conferring authority to enforce any order other than that, the court was not vested with power to enforce any other order, even though it might be of opinion that some other order would be more appropriate. And this, as is said, was the view of the court of appeals of this circuit in the same case on appeal. 43 U. S. App. 308, 21 C. C. A. 103, 74 Fed. 803. Counsel for the commission contends that the supreme court in the Alabama Midland Railway Case expressed a different opinion, and that, therefore, the court is at liberty to mold the order of the commission to conform to the view which the court might think necessary "to do justice in the case." It seems somewhat doubtful whether the supreme court intended to pass upon this question, though possibly the language of the opinion may be susceptible of the construction contended for. Mr. Justice Shiras, in delivering the opinion of the court, said (168 U. S., at page 175, 18 Sup. Ct., at page 52):

"It has been uniformly held by the several circuit courts and the circuit courts of appeal, in such cases, that they are not restricted to the evidence adduced before the commission, nor to a consideration merely of the power

of the commission to make the particular order under question, but that additional evidence may be put in by either party, and that the duty of the court is to decide, as a court of equity, upon the entire body of evidence."

If the construction of this language contended for by counsel for the commission is correct, it must rest, I should presume, with deference, upon the ground that the provision requiring the court to make such determination upon the facts as shall be just should be read in connection with the provision requiring the court, if it finds the order lawful, to issue proper process for its enforcement, and that, when so read, the meaning is that the court shall enforce the order with such modifications as it shall deem just, though probably not an entirely new and different order. But it does not appear to me to be necessary to determine how this is. It is now settled that the commission has no power by its order to fix rates. "either maximum or minimum or absolute." So neither has the court. If, therefore, the court had power to vary the order, it would still be restricted to the making an order enjoining the continuance of an unlawful practice. And this is the character of the order which the commission has made. The case is not one to which the second section is applicable. The inclination of my opinion is that the complaint made to the commission is sustained upon the first section of the act, but, as I am entirely satisfied that the practice complained of is in violation of the third and fourth sections, my judgment will proceed upon that ground. Although the reasons given by the commission do not in all respects correspond with the view here taken, my opinion is that upon the facts the order made is a just and reasonable one, and as near to my own sense of the justice of the case as any the court could devise and is at liberty upon this record to make, construing the order, as I do, to require the respondents to desist from charging a higher rate to Chattanooga than is charged or shall be charged to Nashville. Some range of discretion is undoubtedly vested in the commission in respect to the mode in which the provisions of the act shall be enforced. And so, upon like reasons, the court has a similar equitable discretion when a case is brought before it, and the question is presented whether the order is a right one, and fairly due upon the facts of the case. This is the plain inference from the language of the sixteenth section, which confides to the court in broad terms the power of determining what is just in the premises.

It is urged that the enforcement of this order will disturb the whole scheme of freight rates in a wide section. I am fully conscious of the responsibility I must assume in giving effect to the order, though my expectation is that the companies will find less difficulty in conforming to the order than their counsel seems to fear. But, however that may be, the duty of the court to right the injustice encountered is plain. Surely, it cannot be contended that the rights of one community can be so entangled by a system of rates affecting many others also that justice cannot be done when those rights are denied or withheld. The prayer of the petition of the commission is granted, and an order for process in accordance therewith will be entered.